**ROYAL SWAN NAVIGATION COMPANY LIMITED,**
Plaintiff,

v.

**GLOBAL CONTAINER LINES, LTD., Defendant.**

**No. 94 Civ. 7129 (HB).**

United States District Court,
S.D. New York.

Nov. 16, 1994.

Todd P. Kenyon and William N. France, Healy & Baillie, New York City, for plaintiff.

Peter G. Drakos and Christophil B. Costas, Cardillo & Corbett, New York City, for defendant.

## OPINION AND ORDER

BAER, District Judge,

This case involves a motion to vacate an *ex parte* attachment of defendant's bank account ordered pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Three days following the order the court provided for a post-attachment hearing. At that time, the defendant made the instant motion and moved as well

for damages, attorneys' fees, expenses and costs incurred in connection with the attachment.

## I. BACKGROUND

Plaintiff Royal Swan Navigation Company Limited ("Royal Swan") is a foreign navigation company and hires out its ships to shipping companies. Defendant Global Container Lines Ltd. ("Global")[1] is a foreign corporation that ships goods overseas. On December 1, 1993, the parties entered into an agreement, or "charter party," in which the defendant would charter the plaintiff's vessel, Master Panos. Shortly after the vessel set sail in January of 1994, it encountered rough weather off the coast of Canada. As a result, some of the defendant's deck cargo came loose forcing the Master Panos to take refuge in Newfoundland, Canada. The Master Panos remained in Newfoundland while defendant restored her cargo and made her fit to sail.

In March of 1994, defendant deducted from the amount it owed plaintiff the time period and expenses spent in Newfoundland restowing the cargo. Plaintiff claims that clause 64 of their charter party, which states that "[a]ll deck cargo [is] to be carried at Charterer's risk," entitles it to the deducted portion. Defendant, meanwhile, contends that the shifting of the cargo and subsequent necessity of taking refuge were the fault of plaintiff's captain. On April 29, 1994, the plaintiff demanded arbitration in accordance with clause 17 of the charter party, which provides that the parties will arbitrate disputes in New York City. On May 23, 1994, the defendant appointed its arbitrator. On June 21, the panel was ready to proceed with the arbitration. The arbitration proceedings, which will take place in the Southern District of New York ("Southern District"), have not yet commenced. On September 30, 1994, plaintiff filed for the Rule B attachment in order to obtain security for the unpaid amount. The attachment was granted on October 31, and on that day, the warrant of attachment was served on defendant's ac-

count at Mashreq Bank in the Southern District.

Global asserts several grounds in support of its position that the attachment should be vacated. First, it asserts that the attachment violated Rule B because Global could be "found within" the Southern District. Second, it argues that even if it could not be "found within" the Southern District, the attachment should be set aside because it is abusive in that Royal Swan has exploited the artificial boundary between the Southern and Eastern Districts of New York by pursuing a Rule B attachment in the Southern District when it could easily pursue the more common route of an *in personam* action in the Eastern District.

I find that Global could not be "found within" the Southern District for the purposes of Rule B, because there were no individuals authorized to accept service of process on behalf of Global who were present in the Southern District on a regular basis. Nonetheless, I find the attachment must be vacated as "unfair." Royal Swan has not shown it requires security for any arbitral award it may eventually obtain against Global.

## II. DISCUSSION

### A. *"Found Within" A Given District Under Supplementary Rule B*

 Rule B authorizes, in admiralty and maritime cases, attachment of a defendant's assets as a means of obtaining jurisdiction over a defendant provided the defendant cannot be "found within" the federal district in which the assets are sought to be attached. Supp.R.Fed.R.Civ.P. B(1). The purpose of Rule B is to enable the plaintiff both to acquire jurisdiction over the defendant and obtain security for any resulting judgment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). Cases have held that being "found within" a given district consists of "a two-pronged inquiry: first, whether [the defendant] can be found within

---

1. In its papers, Global identifies itself without a comma between "Lines" and "Ltd.", but Royal Swan had made no motion to amend the caption.

the district in terms of jurisdiction [ ("prong one") ], and second, if so, whether it can be found for service of process [ ("prong two") ]." *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 582 (2d Cir. 1963) (citing *United States v. Cia Naviera Continental S.A.,* 178 F.Supp. 561, 563 (S.D.N.Y.1959)). Because I find, as detailed below, that Global could not be "found within" the Southern District of New York for the purposes of service of process, it is not necessary to consider whether Global's activities in connection with the Southern District rendered it subject to *in personam* jurisdiction here.

■ Service upon a corporation can be made, in accordance with Rules 4(e)(1) and 4(h)(1) of the Federal Rules of Civil Procedure and section 311 of the New York Civil Practice Law and Rules (McKinney 1990), by, among other methods, delivering a copy of the summons and complaint to a director, officer, managing agent, general agent, cashier, or assistant cashier of the corporation, or any other agent authorized by appointment to receive service.

■ Global argues that Royal Swan could have served process on it within the Southern District in several different ways. Global first states that Royal Swan "commenced the [underlying] arbitration with Global by *serving* [Global's lawyers] with its formal demand for arbitration thereby using [Global's lawyers, whose office is in the Southern District] as agents for service of process," and then argues that Royal Swan "could have commenced [an *in personam* action] by again serving [Global's attorneys] who would have again accepted service on behalf of Global." Def.'s Supp.Mem. in Support of Vacat'n of Order of Attachm't and Garnishm't at 4. While status as a party's attorney, without more, does not render the attorney an agent of the party for purposes of service of process, *Integrated Container Serv., Inc. v. Starlines Container Shipping Ltd.,* 476 F.Supp. 119, 125 (S.D.N.Y.1979), a party can of course appoint virtually anyone, including an attorney, as agent for that purpose. Here, however, Global stops short of asserting that its lawyers were its agents for service of process. Instead, Global merely

asserts that Royal Swan "us[ed]" its lawyers as such agents, and that its lawyers would have "again accepted service." Physically accepting process for another party does not mean the acceptor was appointed to do so. (In such a case, however, the party might choose to waive the deficiency in service.) And even if Global's attorneys had been appointed to accept arbitration demands, that does not necessarily mean they were also appointed to accept process. Thus, there is insufficient evidence to conclude that Global had appointed its attorneys as its agents for the purposes of accepting service of process.

Next, Global states that one of its directors travels to the Southern District "almost once a week to appear at the United Nations Headquarters, Purchase and Transportation Service Division at the U.N. Plaza." Supp. Aff. of Hormoz Shayegan, Director of Global at 3. In addition, Global continues, given that the parties' pending arbitration is set to proceed in the Southern District, a "Global director or authorized personnel" would "most surely ... have attended the [arbitration] hearings...." Def.'s Supp.Mem. in Support of Vacat'n of Order of Attachm't and Garnishm't at 3. Consequently, Global argues, it "could have easily been found and served" in the Southern District. *Id.* at 4–5. Moreover, Global contends, although the arbitration panel was ready to proceed by June 21, 1994, Royal Swan "has done nothing since to commence hearings in the arbitration." *Id.* at 3. In this manner, Global asserts, Royal Swan's actions are analogous to those in *Shewan v. Hallenbeck,* 150 F. 231 (S.D.N.Y.1906), where the Southern District vacated an attachment obtained pursuant to a predecessor rule to Rule B because the party seeking the attachment strategically delayed pursuing an action against its adversary solely in order that an attachment could be obtained when the adversary, as expected, left the Southern District a year later. Royal Swan refutes this, claiming that it has not delayed the commencement of hearings for the purpose of obtaining a Rule B attachment, but instead needed time to obtain and instruct an expert who will "determine the cause of the shifting deck cargo" and testify

at the hearings. Aff. of Todd Kenyon, Att'y for Royal Swan, at 2.

■ While a party seeking a Rule B attachment must make a bona fide effort to find its adversary in the given district, *e.g.*, *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580 (2d Cir.1963), it is not necessary that an exhaustive search be conducted. Indeed, in contrast to the instant case, where Global asserts that the transient presence of certain individuals in the Southern District satisfies prong two of the Rule B test, most cases concern whether a party has searched enough to locate an existing permanent office where individuals capable of being served can regularly be found—something much easier to discover than the presence of a transient individual. *E.g., Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A.*, 158 F.Supp. 107 (S.D.N.Y.1957). The presence of a Global director "almost once a week" at a certain office at the United Nations Headquarters is insufficient to satisfy prong two of the test. It exceeds a bona fide effort to effect service under such circumstances, because Royal Swan would first have had to ascertain that a director even went to that office on a somewhat regular basis. Then, Royal Swan would have had to discover a specific week, day, and time at which a Global director would appear at the given office. Furthermore, Royal Swan would had to have gained familiarity with the appearance of the several Global directors in order that they be recognized by the process server. Not only would obtaining such information be difficult, but it would also potentially alert Global to the imminent attachment.

■ The likely presence of a director or individual authorized to receive process at the arbitration hearings, however, poses a more difficult question, as Royal Swan would, in that situation, at least know all potential dates upon which such an individual might appear, and, indeed, based on the progress of the hearings, could anticipate his or her attendance. For example, if the testimony of a

Global director were not finished on a given day, Royal Swan could bring a process server to serve process the following day when the director returned to complete his or her testimony. In certain circumstances, I find that the presence of individuals authorized to accept process at arbitration hearings taking place in the district at issue can satisfy prong two of the Rule B test. This would include the situation where arbitration hearings are underway and the authorized individuals consistently attend. Here, however, there is no certainty as to when an authorized individual will attend, or that one will attend at all. In addition, the hearings have not even commenced. The prong is therefore not satisfied, because a party should not be precluded from obtaining a Rule B attachment merely because its adversary will at some future time enter the district. A party should not have to wait before initiating an action nor is there anything improper *per se* in moving quickly to obtain an attachment.[2] Global's assertion that Royal Swan delayed the commencement of the arbitration hearings for over three months in order to obtain the attachment stretches credibility, given that obtaining an attachment requires relatively little time.

Global might argue that, although it could not be served while physically within the Southern District, it still satisfied prong two of the Rule B test due to Rule 4 of the Federal Rules of Civil Procedure, which enables Royal Swan to serve Global beyond the Southern District boundaries, namely within the Eastern District of New York where it maintains an office and where several of its directors reside and work. The Second Circuit ruled that the attachment should not be available under such circumstances in *Chilean Line Inc. v. United States*, 344 F.2d 757 (2d Cir.1965). *See also D/S A/S Flint v. Sabre Shipping Corp.*, 228 F.Supp. 384 (E.D.N.Y.1964), *aff'd on other grounds sub nom. Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50 (2d Cir. 1965). Subsequent to *Chilean Line*, howev-

---

**2.** Depending on the nature of the defendant's ultimate presence in the district, however, the attachment might be deemed "unfair," as discussed below. This might exist where a defendant moved its headquarters into the district, as that would likely mean that the plaintiff no longer needed the security of the attachment.

er, the Advisory Committee Notes to Rule B indicated that the Advisory Committee had rejected the idea of restricting the availability of Rule B attachments in this manner.

### B. *"Abusive" Attachments Under Supplementary Rule B*

Global further argues that, even if it could not be "found within" the Southern District, Royal Swan's attachment should be set aside because it is "abusive." Def.'s Mem. in Support of Vacat'n of Order of Attachm't and Garnishm't at 10. Explains Global, "Instead of easily pursuing Global [by way of an *in personam* action] in the Eastern District [of New York] ... Plaintiff has chosen to cross the artificial boundary into the Southern District in order to attach Global's bank account...." *Id.* at 1. Indeed, Global might point out that Royal Swan simply could have remained in the Southern District and pursued an *in personam* action instead of utilizing the Rule B attachment (assuming that Global's activities in connection with the Southern District rendered it subject to *in personam* jurisdiction here). In making its argument, Global relies heavily on the Southern District case of *Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.*, 476 F.Supp. 119 (S.D.N.Y.1979). Over a decade after the Advisory Committee had issued the Notes discussed above, the *Integrated* court, while following the Notes as I do here, held that "where an attachment is obtained unfairly in one district where a proper lawsuit could be commenced in another district without unfairness or inconvenience, the courts may easily remedy the situation by exercising discretion to set aside an unfair attachment." [3] *Integrated,* 476

F.Supp. at 124 (citing *D/S A/S Flint v. Sabre Shipping Corp.*, 228 F.Supp. 384 (E.D.N.Y. 1964), *aff'd on other grounds sub nom. Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50 (2d Cir.1965)). *Integrated* found that the attachment at issue was not "unfair," because "[t]here can be no doubt that plaintiffs' need for security is real, that their quest for attachment is not a tactic of harassment." *Id.* See also *Central Hudson Gas and Elec. Corp. v. Empresa Naviera Santa, SA,* 845 F.Supp. 150, 153 (S.D.N.Y. 1994) ("The Rule was not abused, inasmuch as there was a substantial risk that [plaintiff] would not be able to locate sufficient assets to satisfy its claims, which in turn were not frivolous." (citations omitted)); *Western Bulk Carriers (Australia), Pty. v. P.S. Int'l, Ltd.,* 762 F.Supp. 1302, 1309 (S.D.Ohio 1991) ("[T]he Court does have discretion to set aside an unfair attachment where the use of the maritime remedy is abusive, such as where an attachment is obtained unfairly in one district while a proper lawsuit could be commenced in another district without unfairness or convenience." (citing *Integrated* )).

The *Integrated* holding appears consistent with Rule B's purpose, which, as noted above, was explained by the Supreme Court in *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950), as enabling the plaintiff to acquire jurisdiction over a defendant and obtain security for any resulting judgment against the defendant. Under circumstances where the plaintiff can obtain jurisdiction over the defendant in the same or a nearby [4] district independently of a Rule B attachment, and where the plaintiff

---

**3.** Because the charter party that Royal Swan and Global had entered into required arbitration of disputes arising thereunder, filing an *in personam* action against Global would have of course accomplished nothing whether it be in the Southern or Eastern District. It is therefore true in such a situation that an *in personam* action cannot be viewed as an alternative to a Rule B attachment. Nevertheless, the fact that Royal Swan was able to file a valid *in personam* action against Global does reflect that Global engages in significant business activity within the district at issue, and therefore, in accordance with my opinion, necessitates an inquiry into whether the security of a Rule B attachment is needed.

**4.** As noted by Professor Moore, a Rule B attachment would not appear as objectionable where, for example, the adjacent districts of the Eastern and Western Districts of Pennsylvania are concerned, because in that situation, a plaintiff could "eliminat[e] the 300–mile, cross-state trip for execution that may otherwise be necessitated." 7A Moore's Federal Practice ¶ B.06 (2d ed. 1993). In that context, a Rule B attachment would also benefit, for example, a plaintiff who resided in the district where the assets are located, because it could then potentially avoid having to litigate the claim 300 miles away (assuming that the defendant was not otherwise subject to *in personam* jurisdiction in the district where the assets are located).

does not need the security of the attachment to satisfy any judgment it may obtain—a situation that the Advisory Committee may not have considered [5]—the need for either of Rule B's recognized functions does not exist.[6] Employing a Rule B attachment in those situations is consequently "unfair," given, at the least, the inconvenience, and at the worst, the significant financial injury, that the defendant experiences, and should not be permitted.[7]

5. The Fifth Circuit in *LaBanca v. Ostermunchner*, 664 F.2d 65, 68 n. 4 (5th Cir. Unit B Dec. 1981), while relying on the Advisory Committee's Notes in refusing to vacate an attachment on the Florida bank account of two individuals from Venezuela where an *in personam* action could have been initiated in the same district, noted the fact that, without the attachment, the plaintiff "would have little hope of securing the appearance of, or satisfying a judgment against, [the] Venezuela citizens." In so doing, the Fifth Circuit at least left open the possibility that it might rule differently where the need for such security did not exist.

6. By providing jurisdiction simply by virtue of the attachment of assets, Rule B can also enable plaintiffs to litigate their claims in districts that are far more convenient for them than districts where an *in personam* suit could be brought. *See supra* note 4. Whether that possibility by itself is sufficient to warrant the use of a Rule B attachment is a question I need not address here, where the parties' agreement to arbitrate precludes litigation of the underlying dispute, *see supra* note 3, and, even if the dispute could be litigated, Royal Swan could file an *in personam* action against Global in the Southern District if, as Global contends, its activities in connection with the Southern District cause it to be subject to *in personam* jurisdiction here.

Whether the Rule B attachment would have enabled Royal Swan to eliminate a "300–mile, cross-state trip" to satisfy its arbitral award, *see supra* note 4, is not at issue here, as Global does of course have assets in the Southern District where the dispute will be arbitrated, and even if Global moved those assets, the proximity of its offices to the Southern District likely means the magnitude of the distance contemplated by Professor Moore does not exist in the instant case, *id.* Besides, Royal Swan did not contend that the Eastern District is a less convenient forum for it than the Southern District in terms of enforcing a judgment.

Moreover, it is not necessary to consider whether the added step required to enforce judgments across the more substantive boundaries of state lines by itself justifies a Rule B attachment, because here the federal districts at issue are within the same state.

## C. *Royal Swan's Need for Security*

██ In *Integrated*, three months before the attachments were granted, the defendants, foreign corporations, had closed their common New York office, disconnected their common telephone line in New York, and, in fact, ceased doing business anywhere. *Integrated*, 476 F.Supp. at 123. Those facts left little doubt as to the plaintiff's need for security. Accordingly, at the post-attachment hearing in the instant case, the court indicat-

7. Professor Moore appears to suggest that an otherwise permissible Rule B attachment should be denied only where both "the plaintiff and defendant carry on substantial and continuing business activities in another district where an in personam proceeding could have been commenced." 7A Moore's Federal Practice ¶ B.06 (2d ed. 1993) (footnote omitted). I do not make such a holding, and explain by way of example, which, I will emphasize, consists of facts that do not exist in the instant case. A profitable defendant corporation may have its only offices and production facilities in the Eastern District of New York, engage in substantial business in the Southern District of New York, have a bank account in the Southern District of New York, and be available for service of process only in the Eastern District, where all potential recipients of service work and reside. A plaintiff corporation that only has offices in California would naturally prefer to obtain a Rule B attachment in the Southern District rather than pursue an *in personam* suit in that same district or the Eastern District due to the added pressure and inconvenience experienced by the defendant when its assets are attached. In that situation, because the defendant is subject to jurisdiction in the Southern District and can receive process at its offices in the Eastern District issued from the Southern District, and because the defendant's operations are profitable and all of its offices and production facilities are located in New York State, the attachment should not be granted. In accordance with my holding above, the plaintiff can independently obtain jurisdiction over the defendant and does not need the security of an attachment for any subsequent judgment. This analysis does not change simply because there exists no jurisdiction where both "the plaintiff and defendant carry on substantial and continuing business activities ... where an in personam proceeding could have been commenced." *Cf. Western Bulk Carriers (Australia), Pty. v. P.S. Int'l, Ltd.*, 762 F.Supp. 1302, 1309 (S.D.Ohio 1991) (following Professor Moore's position in permitting a Rule B attachment even though an *in personam* action could have been instituted in an adjacent federal district, located in an adjoining state, primarily because the plaintiff was an Australia corporation that did not engage in any business in that adjacent district).

ed that one of its primary concerns in adjudicating the motion to vacate revolved around whether or not Royal Swan needed the security of the attachment in light of Global's oral assertions, reflected in its papers, that Global "has continuously maintained ... offices in Garden City, New York since 1985," has maintained the account that was attached with the same bank since 1985, which account is Global's "primary bank account," and "regularly conducts business in the City of New York [8] with ship owners, ship brokers, insurance companies, lawyers, accountants, suppliers, and other professionals engaged in the shipping business." Aff. of Hormoz Shayegan, Director of Global at 1–2, 4.

Pursuant to Rule 12 of the Admiralty Rules of the Southern District of New York, the party seeking to maintain the attachment bears the burden of showing "why the ... attachment should not be vacated" after the adversary has "show[n] ... any improper practice or a manifest want of equity on the part of the" other party. Indeed, this burden was detailed in the order that granted the attachment, which order Royal Swan had itself drafted for my signature. In the memorandum that it prepared at my direction after the post-attachment hearing, however, Royal Swan made no claim that it would have difficulty satisfying any ultimate arbitral award against Global. It did not allege, for example, that Global was financially troubled or that it would encounter difficulty in locat-

ing Global's assets. Nor did it request discovery on the matter.

During the *ex parte* correspondence that the court engaged in with Royal Swan in the court's efforts to ascertain if "the conditions set forth in [Rule B] appear to exist," as it is required to do by that rule, Royal Swan indicated that it was ignorant of the nature and size of Global's presence in Garden City [9] and could not state one way or the other whether Global engaged in business activity in the Southern District. After Global made its assertions at the hearing and in its initial papers, and after the court informed the parties of what it identified as the relevant issues, Royal Swan's failure to address them in the memorandum it subsequently submitted can be taken to mean only that Royal Swan is now sufficiently informed. Global has maintained offices in Garden City continuously since 1985 and there are no allegations that Global is financially troubled. Global has not resisted arbitration nor given any other indication that it is attempting to avoid adjudication of the dispute, a factor that might lead a plaintiff to suspect the need for security. It therefore appears that Royal Swan does not need security for its claim any more than the typical plaintiff might, and, in the absence of even an assertion by Royal Swan to the contrary, I cannot find that it needs the security of the Rule B attachment. I therefore vacate the attachment.

**8.** By merely stating "New York City," without more, Global leaves in doubt whether all, some, or none of the noted activities occurred in New York City's Bronx and New York counties, which are within the confines of the Southern District of New York, as opposed to New York City's three remaining counties—Kings, Queens, and Richmond—which fall within the Eastern District of New York's jurisdiction. 28 U.S.C. § 112(b)–(c) (1993). Although Global's Supplemental Affidavit refers to the "other business activities in Manhattan as mentioned in [the] [initial] affidavit," Supp.Aff. of Hormoz Shayegan, Director of Global at 3, it likewise fails to specify which of those "other business activities" occurred in New York City's Borough of Manhattan, which consists of the identical geographical area as New York State's New York County.

Because I find, as explained above, that Global could not be "found within" the Southern District of New York for the purposes of service of process, it is not relevant to this case what por-

tion, if any, of the stated activities occurred in the Southern District, as opposed to the Eastern District, of New York. This was not clear at the time of the hearing, however, and Royal Swan's failure to raise the matter, either at the hearing, or in the memorandum that it subsequently filed, therefore serves as another example of its failure to address the dispositive, or potentially dispositive, issues of the case. This appears especially egregious by noting that the specific confines of the Southern District had only recently been impressed upon Royal Swan when the court informed Royal Swan that the affidavit it submitted *ex parte* when it requested the attachment indicated searches of only those telephone listings for the Southern District counties within New York City, and none of those for the remaining Southern District counties of Dutchess, Orange, Putnam, Rockland, Sullivan, and Westchester.

**9.** Royal Swan referred to it as an "agent or office." Aff. of William France, Att'y for Royal Swan, Under Supp.Rule B at 2.

### D. *Global's Motion for Expenses*

 My decision indicates that although an attachment is available in accordance with the letter of Rule B, it should not be granted if it does not accord with the spirit of the rule. As indicated above, the *ex parte* correspondence this court engaged in with Royal Swan sought to ascertain whether the desired attachment satisfied both the letter and spirit of the rule, by examining whether Royal Swan had a need for security. In that regard, Royal Swan informed the court that it was unaware of the extent of Global's presence in the Eastern and Southern Districts. Because the court understood the difficulty of obtaining that information without alerting Global to the possible attachment, it granted the attachment with the intention that the adversarial process, including discovery, would quickly reveal whether a need for security exists. Notwithstanding that I have vacated the attachment, the awarding of expenses is inappropriate where, as here, obtaining the information needed to conclude whether an attachment is permissible may very well render the issue moot by alerting the other party of the plaintiff's plans. *See supra* pp. 602–603 (discussing how Royal Swan had no duty to discover the presence of certain Global directors at the United Nations Headquarters particularly because it would "potentially alert Global to the imminent attachment"). If, however, Global has reason to believe that Royal Swan was cognizant of the extent of Global's presence, whether as a result of its interaction with Global in connection with the charter party at issue, Global's stature in the industry, or other circumstances, it may bring a motion for reconsideration of this motion for expenses, where the court will also consider the imposition of sanctions for the misrepresentations that might have been made to the court.

### III. CONCLUSION

The Rule B attachment is vacated. The motion for expenses is denied.

**SO ORDERED.**